IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 29, 2020 at Knoxville

**ANTONIO WICKS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 10-01779      James M. Lammey, Judge

_____

**No. W2019-02187-CCA-R3-PC**

_____

A Shelby County jury convicted Petitioner, Antonio Wicks, of second degree murder in the death of the victim, Donald Miller, and the trial court sentenced Petitioner to 25 years' incarceration as a Range I violent offender. This court affirmed Petitioner's conviction on direct appeal. *See State v. Antonio Wicks*, No. W2011-00964-CCA-R3-CD, 2012 WL 1424717, at *1 (Tenn. Crim. App. Apr. 23, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012). Petitioner filed a pro se post-conviction petition and four amended petitions following the appointment of counsel. Following a hearing, the post-conviction court denied relief. Petitioner now appeals, claiming that he was denied the effective assistance of counsel because trial counsel failed to (1) move for a mistrial due to only having eleven jurors; (2) file a motion to dismiss the indictment pursuant to *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999); (3) cross-examine the State's witness regarding the loss or destruction of potentially exculpatory evidence; (4) object to improper prosecutorial argument; and (5) raise in the motion for new trial and on direct appeal the failure to cross-examine a witness and improper prosecutorial argument. After a thorough review of the record and applicable case law, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Jason M. Matthews, Memphis, Tennessee, for the appellant, Antonio Wicks.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

### Trial

On direct appeal, this court summarized the facts of the case as follows:

Rubysteen Miller last saw her 17-year-old son, Donald Miller, on February 1, 2008. She picked up the victim from school at 2:15 that afternoon and went home. Soon after arriving home, [Petitioner] . . . knocked on the door to visit the victim. The two asked Ms. Miller for a ride to "Westwood," and she dropped them off as she went to run errands. At approximately 5:30 that evening, Ms. Miller saw the victim and [Petitioner] talking on her front porch before the two left again. Ms. Miller could not hear their conversation, but she did not detect any animosity between the victim and [Petitioner]. When the victim failed to return home that night, Ms. Miller telephoned the Memphis Police Department (MPD) to report the victim missing. Ms. Miller testified at trial that she "knew right then and there that something happened because Donald d[id not] stay out at night."

Ms. Miller testified that [Petitioner] and the victim had known each other for "some years" and that, although they were not "kickin' buddies," they were friends. On February 2, Ms. Miller asked [Petitioner] if he knew where the victim might be. [Petitioner] told Ms. Miller that the victim had been involved in a "gang initiation" the previous night. Ms. Miller had no knowledge of the victim's or [Petitioner]'s association with gangs until that day.

On Saturday, February 9, Warren Randolph and a friend were walking through the woods behind Chickasaw Middle School when they "stumbled over a body." They immediately contacted a friend's father who called the police. Mr. Randolph recalled that the body was lying "face down with a black hooded sweatshirt on, some khaki pants, and some black socks." Shoes were missing from the body. Mr. Randolph later learned that the victim was an older teenager whom he knew from the neighborhood as "D.J."

Jaqohn Carr and the victim were best friends and also members of the same gang, the Vice Lords. Mr. Carr knew [Petitioner] from the

neighborhood and also knew that [Petitioner] was affiliated with another gang, the Bloods. On February 1, 2008, Mr. Carr saw the victim's mother driving [Petitioner] and the victim somewhere. Later that evening, the victim's girlfriend, Kiara Love, stopped by Mr. Carr's home looking for the victim because she and the victim had scheduled a date that night. As Ms. Love and Mr. Carr talked outside Mr. Carr's home, they saw [Petitioner] walking up the street from the vicinity of Chickasaw Middle School. They asked [Petitioner] if he had seen the victim, and [Petitioner] denied knowing anything about the victim's whereabouts. On February 3, Mr. Carr asked [Petitioner] if he knew anything about the victim's disappearance, and [Petitioner] claimed that the victim "went to some type of gang meeting." On February 9, Mr. Carr learned of the victim's death. He went to the scene but did not go into the woods to see the victim. He recalled at trial that the victim was wearing a black hooded sweatshirt, khaki Dickie pants, and black and white Nike Air Jordans when he last saw the victim on February 1, 2008.

Mr. Carr testified that, despite being members of different gangs, [Petitioner], the victim, and he all grew up in the same neighborhood, would play basketball together, and would casually socialize. He knew of no animosity between [Petitioner] and the victim. On cross-examination, he said that [Petitioner] did not appear to have any blood on his clothing or hands when talking to Mr. Carr on the evening of February 1.

Kiara Love met the victim when she was in the tenth grade, and they dated throughout high school. She last saw the victim at her home on January 31, 2008, but she exchanged text messages with the victim during the school day on February 1. After the victim failed to show up for a date later that evening, Ms. Love telephoned the victim without success. She eventually went to Mr. Carr's home to ask Mr. Carr if he had seen the victim. While at Mr. Carr's home, she saw [Petitioner] walking down the street from the direction of Chickasaw Middle School. She said that when she and Mr. Carr asked [Petitioner] if he had seen the victim, [Petitioner] "act[ed] kind of weird" and "just stood there in silence." Some time before the discovery of the victim's body, Ms. Love and a friend telephoned [Petitioner] and asked if he knew anything about the victim's disappearance. She said that [Petitioner] hung up the telephone on them. She testified that the clothing on the victim's body when it was discovered was the same clothing she had seen the victim wearing on February 1 at school.

MPD Officer Brian Barnes received a call for a "man down" on February 9 and arrived at a wooded area at approximately 5:45 p.m., where he observed the victim "lying face down . . . underneath some leaves." The victim was dressed in a black hooded sweatshirt, khaki shorts, black socks, and no shoes. Officer Barnes assisted in securing the crime scene. When Memphis Fire Department emergency personnel arrived, they pronounced the victim dead from a gunshot wound to his head.

Sergeant Anthony Mullins arrived at the scene where he observed that the victim had a "fairly large size hole" above his right ear that appeared to have been caused by a bullet. Sergeant Mullins also observed that the victim's body had been covered by leaves in an attempt to avoid discovery. On February 10, 2008, Sergeant Mullins questioned [Petitioner] regarding the victim's disappearance. [Petitioner] told Sergeant Mullins that he had seen "some guys put[ting the victim] in a trunk of a car" near [Petitioner]'s home. When Sergeant Mullins assisted in conducting a consensual search of [Petitioner]'s home, he noted that [Petitioner]'s view of the street, as described in his statement, was obscured by hedges outside the home, making it difficult for [Petitioner] to have seen anyone forcing the victim into a car from that vantage point. Sergeant Mullins acknowledged at trial that officers discovered no incriminating evidence— bloody clothing, a gun, or the victim's missing shoes—from the search of [Petitioner]'s home.

Doctor Marco Ross, a forensic pathologist with the Shelby County Medical Examiner's Office, performed the autopsy on the victim and determined the victim's cause of death to be multiple gunshot wounds to the head. The victim suffered one contact wound to his right temple, and that bullet lodged in the left side of his scalp. He also suffered three other wounds to the right side of his head. Doctor Ross retrieved three bullets from the victim's brain, two from wounds to the right side of the head and one from a wound to the left side of the head. Doctor Ross determined the bullet retrieved from the victim's scalp was "medium caliber," but he said that the remaining bullets appeared smaller in size.

MPD Lieutenant Ronald Collins assisted in the missing person investigation initiated by the victim's mother on February 2. Lieutenant Collins interviewed [Petitioner] on February 8, the day before the discovery of the victim's body. [Petitioner] told Lieutenant Collins that he had last seen the victim as he was being forced into a car by three men named "Charles, Mack, and Spudd." [Petitioner] explained that the men pulled up

to a stop sign where the victim stood and wrestled the victim into the trunk of their car. [Petitioner] said that the driver, "Spudd," appeared to have a gun. [Petitioner] told Lieutenant Collins that he did not report what he witnessed because he was afraid. He also opined that the men and the victim were "feuding" over a stolen dog.

Kelvin Payne, the victim's cousin, shared a cell block with [Petitioner] at the Shelby County Correctional Center (SCCC) in December 2008 while serving a sentence for driving while impaired. He testified at trial that he overheard [Petitioner], who did not know Mr. Payne was related to the victim, tell another inmate that he had been charged with murder. Mr. Payne said that [Petitioner] explained that the victim "violated"—a term referring to disrespecting another gang member.

Barrett McReynolds was incarcerated at SCCC in December 2009. While there, he shared a cell with [Petitioner], who told Mr. Barrett that he was incarcerated for a homicide. Mr. Barrett recalled that [Petitioner] did not discuss his case initially. Over time, however, Mr. Barrett "could tell something was bothering [Petitioner]," and [Petitioner] eventually began discussing the case. [Petitioner] told Mr. Barrett that a "young man was shot several times in his head." Through the course of their conversations, [Petitioner] confessed to shooting the victim "behind a school in some woods." In explanation of the shooting, [Petitioner] told Mr. Barrett that "nobody's gonna mess with my cousin."

Jimmy Chambers, an investigator with the Shelby County District Attorney's Office with specialized knowledge in gangs, testified that there are over 20,000 gang members in Shelby County with memberships predominantly in four nationally-known gangs—the Bloods, the Vice Lords, the Crips, and the Gangster Disciples. He further testified that the term "violation" refers to a rule that "if a member do[es] something wrong within the gang set, they would be punished." Mr. Chambers said that punishment could include a drop in "rank," assault, banishment, or death. Mr. Chambers explained that punishment for a "violation" usually occurs within a gang and not between rival gangs. He added, however, that gang initiations sometimes include punishing someone who "disrespects" a rival gang member. Mr. Chambers explained that the gang society does not tolerate "disrespect" and that the consequences of "disrespect" include death.

- 5 -

On November 2, 2008, MPD Officer Stephen Robert Breth responded to a call of an "armed party fleeing the scene" at the Nike Outlet Store in Memphis. Upon his arrival, Officer Breth apprehended [Petitioner], whom store personnel identified as the fleeing individual but who was also unarmed when apprehended. A brief search of the area near [Petitioner]'s apprehension, however, revealed a "black revolver, police style Colt pistol with tape around the handle." The revolver contained four .32 Smith and Wesson bullets.

On November 2, 2008, MPD Officer Eric Moore was working at the Nike Outlet Store performing "secondary duties" as a loss prevention officer. When a store employee alerted Officer Moore that someone was attempting to steal items from the store, Officer Moore stopped the individual directly outside the store. The person immediately ran, and as the person fled, Officer Moore noticed a revolver with duct tape on the handle protruding from the waistband of the person's pants. He called for assistance, and officers soon arrived to discover [Petitioner] behind a nearby Payless Shoe Store. Officer Moore identified [Petitioner] as the suspected shoplifter. Officer Moore recalled that [Petitioner] was unarmed at his apprehension, but officers located an abandoned gun in the same area where [Petitioner] had been found. The gun's handle was wrapped in duct tape, fitting the description of the one seen by Officer Moore protruding from [Petitioner]'s waistband.

The parties stipulated that [Petitioner] was charged with unlawful possession of a weapon stemming from the Nike Outlet Store incident. He pleaded guilty to the offense on February 2, 2009.

MPD Homicide Investigator David Parks acted as lead investigator on the victim's homicide. On February 9, 2008, Officer Parks arrived at the scene near Chickasaw Middle School and confirmed that the body found was the victim, who had been "missing for about a week." On February 27, 2008, Officer Parks forwarded the bullets and bullet fragments collected at the victim's autopsy to the Tennessee Bureau of Investigation (TBI) Crime Laboratory. On December 17, 2008, following [Petitioner]'s arrest for the unlawful possession of a weapon, Officer Parks also forwarded the .32 Colt revolver recovered at the outlet mall to the TBI Crime Laboratory.

Cervinia Braswell, a firearms identification expert with the TBI, testified at trial that she first confirmed that the Colt revolver was working properly. Her analysis further revealed that a .32 full metal jacket bullet

recovered from the victim's parietal lobe and another bullet recovered from the victim's temporal muscle shared a "mechanical fingerprint" with the Colt revolver and had both been fired from that gun. Ms. Braswell also determined that three .32 bullet fragments bore similar characteristics to having been fired by the Colt revolver; however, she could not make a conclusive match due to the "mutilated condition" of the fragments. Ms. Braswell opined that a lower velocity weapon, such as the one examined in the instant case, would not produce "as much" blood spatter as a higher caliber weapon.

MPD Lieutenant Richard Borgers testified at trial that the Colt revolver was inadvertently destroyed after completion of the weapons offense prosecution because evidence bureau paperwork had not linked the gun to the instant murder prosecution. Upon learning of this procedural glitch, the MPD implemented additional safeguards and tagging policies to prevent future inadvertent losses of evidence.

On July 20, 2009, Officer Parks questioned [Petitioner] regarding his involvement in the victim's death. [Petitioner], who had already been convicted of the weapons offense via a guilty plea, denied possessing the gun at the outlet mall. When questioned regarding the victim's death, [Petitioner] became "really non-responsive" and "looked dumbfounded." Officer Parks determined [Petitioner]'s lack of candor stemmed from [Petitioner]'s wanting to maintain an account consistent with his 2008 statement.

On cross-examination, Officer Parks testified that he talked to witnesses for over a year following the victim's death. He explained his attempts to locate the three individuals that [Petitioner] had claimed forced the victim into a vehicle and related that he followed several leads. Officer Parks explained that the investigation into the three individuals was hampered by the general descriptions and names provided by [Petitioner] in his 2008 statement. Officer Parks said, "[Y]ou're not always sure you're talking to the correct people." He also recalled some hesitancy among neighborhood witnesses to volunteer additional information concerning the victim's death. In fact, several neighbors claimed never to have heard of the individuals named by [Petitioner], so Officer Parks ultimately assumed that [Petitioner] had fabricated the names. Furthermore, Officer Parks could not substantiate through interviews with any other neighborhood witnesses [Petitioner]'s allegation that the victim had been kidnapped from the street corner.

*Antonio Wicks*, 2012 WL 1424717, at \*1-5.

Petitioner filed a timely pro se post-conviction petition and five amended petitions through counsel, claiming (1) improper prosecutorial argument; (2) improper enhancement of his sentence; (3) failure of the State to preserve exculpatory evidence; (4) a violation of his right against self-incrimination; and (5) ineffective assistance of counsel. Petitioner claimed that he was denied the effective assistance of counsel because trial counsel failed to (a) confer with Petitioner; (b) investigate and prepare for trial; (c) object to and raise in the motion for new trial that the State made improper prosecutorial arguments; (d) file a *Ferguson* motion due to lost or destroyed potentially exculpatory evidence; (e) object to a violation of Petitioner's right against self-incrimination; (f) object to and raise in the motion for new trial that the State failed to provide proper notice of sentencing enhancement factors; (g) cross-examine the State's witness regarding the destruction of potentially exculpatory evidence; (h) raise in the motion for new trial that the State destroyed potentially exculpatory evidence; (i) move for a mistrial due to having only eleven jurors; (j) argue at sentencing that Petitioner had only one prior misdemeanor; (k) object to the admission of a photograph of the murder weapon; (l) move for a mistrial when a State's witness committed and admitted to perjury; (m) file a motion to suppress Petitioner's statement because he was a juvenile questioned without his parent or an attorney; (n) "request a mistrial after learning [t]hat a juror refused to deliberate"; and (o) inquire into the specific question presented to the trial court from the jury regarding failure to reach a consensus.

Petitioner further claimed that he was denied the effective assistance of appellate counsel because appellate counsel failed to raise on direct appeal (1) that the State failed to provide proper notice of sentencing enhancement factors; (2) that the State destroyed potentially exculpatory evidence; (3) that the prosecutors made improper prosecutorial arguments; and (4) a challenge to the affidavit of complaint used to secure Petitioner's indictment. Finally, Petitioner argued that the trial court erred by allowing the jury to deliberate with only eleven jurors and by allowing the State "to display a weapon when the weapon was not used to commit the crime."

*Post-Conviction Hearing*

Trial counsel testified that one of the jurors had a death in his family during trial and was dismissed from service, resulting in deliberation with eleven jurors. He stated, "I [told] [Petitioner] that he had a right to a mistrial at that point, but looking back I think it inured to his benefit." He continued, "[Petitioner] had the right to be decided -- for his case to be decided by [twelve] jurors. But with the way that the proof unfolded and the jury composition with the alternates who were struck, [Petitioner] decided to proceed

with [eleven] jurors." Trial counsel said that he did not raise the issue on appeal "because [Petitioner] waived it" and because "it inured to his benefit" because Petitioner was convicted of a lesser-included offense instead of first degree premeditated murder.

Trial counsel recalled that the gun connected to the crime had been "lost or destroyed by the property and evidence room" after it had been through ballistics testing. A photograph of the gun was submitted as evidence in place of the gun. Trial counsel asked for a special jury instruction regarding the loss of the gun, and the trial court denied his motion. Trial counsel did not believe that having the actual gun at trial would have been exculpatory. Trial counsel did not recall whether he raised the fact that the gun was the only direct evidence linking Petitioner to the crime, and he did not recall if he objected to the reliability and authenticity of the photograph of the gun. Trial counsel did not believe that having access to the gun would have affected the outcome of the trial because Petitioner had already pled guilty to possessing the gun.

Trial counsel did not recall the State's witness Lieutenant Borgers and did not recall if he cross-examined Lieutenant Borgers. He said, "I believe [Petitioner] was paraded in front of the jury and showed the jury his tattoos." Trial counsel testified that Petitioner was required to show his tattoos to the jury, but he did not believe that rose to the level of "having to provide testimony."

Trial counsel did not remember the prosecutors' closing argument. Trial counsel did not object during closing argument when one prosecutor[1] stated repeatedly that Petitioner had lied and was guilty. Trial counsel explained, "I don't generally object very much during a trial unless it's [an] egregious violation. It makes the defense look desperate. . . . I don't want to look weak, stupid, and desperate." Trial counsel said that Petitioner had made several inconsistent statements, so he could not object when Petitioner had, in fact, lied. Trial counsel did not object to the prosecutor's remarks about the credibility of two other witnesses because "[he] didn't think at the time that it rose to the level of a violation" and "didn't think that was particularly inappropriate."

Trial counsel did not object when the State failed to file their motion to enhance punishment fewer than ten days before sentencing. He recalled arguing at the sentencing hearing that Petitioner only had one prior misdemeanor on his criminal record, and he raised the sentencing issue on direct appeal as well. Trial counsel said that Petitioner was "fairly involved in his defense" at trial and that he and co-counsel spoke with Petitioner frequently.

---

[1] One prosecutor provided the initial closing argument, and another prosecutor made the rebuttal closing argument.

- 9 -

Trial counsel recalled a "heated" cross-examination of Lieutenant Collins but did not remember whether he requested a mistrial following Lieutenant Collins's testimony. He did not remember the substance of Lieutenant Collins's testimony.

Trial counsel did not file a motion to suppress Petitioner's statement, explaining that Petitioner did not give an "inculpatory statement." He explained, "The worst part about the case was [Petitioner's] having pled guilty in a separate instance to possession of the murder weapon. . . . And that plea, his accepting responsibility for possession of the murder weapon several months after the murder was, in my opinion, the worst part about the case."

Trial counsel said that the jury sent a question to the trial judge asking what happened if they could not agree on a verdict. He did not move for a mistrial after the question from the jury to the trial court. He remembered many of the jurors appearing angry, and they explained to him after deliberations that one juror refused to convict on first degree premeditated murder.

Trial counsel testified that his investigator looked into the possibility that a third party had committed the murder. He reiterated that, because Petitioner pled guilty prior to trial to possessing the firearm used in the murder, the theory of a third party was less plausible. He stated that no evidence of third party involvement in the murder came up at trial.

On cross-examination, trial counsel stated that he had been practicing law for fourteen years at the time of trial and that he had tried several murder cases, including capital cases. He said that he challenged Officer Mullins and Lieutenant Collins regarding the missing gun. Trial counsel stated that his investigator was "competent" and "thorough." He agreed that many of Petitioner's out-of-court statements involved Petitioner's location at the time of the murder and when he last saw the victim. Trial counsel believed that the discrepancies in those statements had been fairly raised by the proof and that the prosecutor's closing argument was "fairly mild compared to other closing arguments" that he had experienced.

Trial counsel agreed that evidence other than the gun linked Petitioner to the murder, including that Petitioner was the last person seen with the victim before his death and that Petitioner was seen near the location where the body was found near the time of death.

The post-conviction court referred to an incident that occurred in an unrelated case, which trial counsel wanted to use to impeach Lieutenant Collins's credibility at trial:

- 10 -

[T]hey[2] got [Lieutenant Collins] to admit that some of the things he subsequently found out in [an] affidavit of complaint weren't true. And the guy was truthful to a fault because they got him to admit then that would have been a lie. ["]Well, I suppose it was.["] ["]So, in other words you lied when you swore.["] ["]Well, I guess I did.["]

. . . .

And so they tried to pull the same thing in here and I wouldn't let them do it because I thought it was unethical.

. . . .

All of it reeked and I stopped the proceedings . . . and said I'm not going to allow you to do that. And I told [Lieutenant] Collins[, "Y]ou did not commit perjury. You are not a liar because you would have had to have known at the time you swore to that affidavit that you lied.["] And he said, ["]well, I didn't know at the time I swore the affidavit. I just found out later that they were lying to me.["] And I'm going, well, that doesn't make you a liar even though he thought it did. I don't know why he thought it did.

Post-conviction counsel suggested calling Lieutenant Collins to testify, but the post-conviction court stated, "Well, I just laid it out pretty clear that it's totally irrelevant. I wouldn't have allowed that testimony at trial. But I think I described it pretty accurately."

Petitioner testified that, after the juror alternates were excused, the trial court dismissed another juror who was dealing with a family tragedy. Petitioner said that he asked trial counsel if "it was okay to proceed" with only eleven jurors and stated that it was trial counsel's choice to proceed with only eleven jurors. Petitioner said that, had he known that he had a right to proceed with twelve jurors, he would have insisted on it. Petitioner testified that trial counsel never objected to having only eleven jurors and that he never waived his right to have twelve jurors. Petitioner said that the jury convicted him of the lesser-included offense of second degree murder. He stated that trial counsel did not sufficiently explain the jury instructions "in depths" because the jury was made up of "common people" who "really [did not] know [anything] about the law or whatever."

---

[2] "They" referred to the attorneys in the unrelated case.

- 11 -

Petitioner testified that there was no physical evidence presented at trial linking him to the murder because "[t]he handgun was destroyed." He agreed that the gun was involved in another case and was destroyed following the conclusion of that case but said that, "if [the gun] was allegedly supposed to been involved in this case then why it wasn't tagged on this case[?]" When asked if trial counsel filed any kind of motion related to the loss of the gun, Petitioner explained that trial counsel raised it at trial but not on direct appeal. Petitioner also stated that trial counsel failed to cross-examine Lieutenant Borgers regarding the destruction of the gun.

Petitioner claimed that the detective who arrested him for unlawful gun possession stated that the picture of the gun which was admitted at trial "was not the revolver that was recovered on November 2, 2008." He explained, "So, they w[ere] saying that this wasn't the gun. The picture they had well, was not the gun that I was caught with. That's what he was saying. To sum all that up that was not the gun."

Petitioner stated that trial counsel refused to submit to the jury Petitioner's story of how he obtained the gun. He said, "[Trial counsel] didn't want to say that I actually got the gun from someone." Petitioner explained that he purchased the gun for sixty dollars from someone he did not know.

Petitioner testified that trial counsel failed to object to improper prosecutorial argument during closing argument. He said that the prosecutor used "certain words and certain phrases . . . to make me look like the bad guy. Like how [she] was trying to say I was a liar[,] and I was this, I was that. And they tried to berate my lawyer as well. They tried to downplay my lawyer." He said that the prosecutor was "vouching for the witnesses." Petitioner stated that trial counsel failed to raise this issue on direct appeal as well.

Petitioner recalled "some instances of perjury" involving Lieutenant Collins. However, the post-conviction court interjected that that issue was irrelevant, stating:

> We've discussed that thing so many times, sir. What was done in Division 6 was improper. There was no objection by the State. And I wasn't going to allow the same thing to happen here.
>
> That poor investigator that was being very truthful and was truthful to a fault because he didn't know the difference between a lie and just making a mistake. So I wasn't going to let the jury hear him admit to lying when he didn't.

- 12 -

So, that was me that did that and I stand by it today and I'll stand by it forever. So, let's go to another issue.

Petitioner stated that trial counsel did not investigate a "jailhouse snitch" who testified against Petitioner and then received parole. Petitioner claimed that this witness "lied . . . to get out of jail" and that first post-conviction counsel[3] discovered this. Petitioner said that, because current post-conviction counsel did not seek this information from first post-conviction counsel and did not call first post-conviction counsel to testify at the post-conviction hearing as to what he discovered, Petitioner wanted to postpone the hearing.[4]

Petitioner stated that, because one juror refused to deliberate and because the jury asked about what to do if they could not reach a verdict, trial counsel should have requested a mistrial. Petitioner named two individuals that he said "confessed to kill[ing] the [seventeen]-year-old in a fight" and stated that trial counsel never investigated these names.

Petitioner said that trial counsel failed to object when the trial court required that he roll up his sleeves and show his tattoos to the jury. He explained,

I actually wanted to testify, but [trial counsel] told me not to. He was saying that I was a gang member. Okay, then. Yes, sir. I'm part of a gang. Yes, sir. I'm admitting that. But at the same time it was no like -- I didn't supposed to like show my gang tattoo like far as like -- that didn't have nothing to do with the case. Period.

So, it was like . . . self-incrimination . . . presenting evidence against myself.

Petitioner testified that first post-conviction counsel discovered there had been a plea offer from the State but that trial counsel had never presented him with the plea offer. He said that second post-conviction counsel failed to seek this evidence as well.

Petitioner said that trial counsel did not object when the State failed to provide proper notice seeking an enhanced sentence and did not object when the trial court improperly labeled him a "convicted felon" at sentencing even though he only had one prior misdemeanor conviction.

---

[3] Petitioner had one prior post-conviction counsel who withdrew from the case.

[4] Post-conviction counsel told the post-conviction court, "I know exactly what he's talking about because I drafted out a template petition for Writ of Error Coram [N]obis. I have never received any physical proof that there was a deal entered into or anything. I did investigate into it."

- 13 -

On cross-examination, Petitioner denied that trial counsel or the trial court explained to him that his case was "a no-deals case." He recalled the trial court questioning him about his decision not to testify at trial but claimed he was "influenced" by trial counsel. He agreed that he pled guilty to unlawful possession of the gun which was used in this murder but said that the picture of the gun presented to the jury was not the weapon used in the murder. Petitioner agreed that the prosecutor explained to the jury that the gun was "the same type" of gun used in the murder and was "similar" but was not the actual murder weapon.

Petitioner recalled that, when the jury only had eleven members, trial counsel explained that requesting a mistrial would result in a second trial, which meant that the State would know his defense strategy. He agreed that trial counsel cross-examined one officer regarding possible third party suspects to the crime and that, because the trial court cut off the cross-examination, trial counsel raised the issue on direct appeal.

On redirect examination, Petitioner stated that he had no reason to say anything about the crime to the "jailhouse snitch" who testified against him because they "didn't have [a] relationship like that." He said, "We didn't have [a] bond or [any]thing like that whatever. The guy he felt like I was a[n] easy target to get out of jail. He used me to try to get out of jail. And he did that."

The post-conviction court denied the petition, stating that nothing in the petition would rise to the level of ineffective assistance of counsel. Regarding having a jury of eleven members, the post-conviction court believed that trial counsel made a reasonable tactical choice not to object. It explained, "[I]f there are any mistakes the State made in this trial they would have a second bite and they'd know what the defense is; they'd know what questions to perhaps not ask or ways to kind of clear up any problems that existed in the first trial." The post-conviction court did not have "any specific recollection" but was confident that it would have ensured that Petitioner made the choice himself to proceed with eleven jurors. It also noted that the jury returned a verdict on second degree murder rather than first degree murder and said, "Had the other [twelfth] juror been there[,] he may have turned those other two around and convinced them it was murder one, in which case we'd be talking about [fifty-one] years."

The post-conviction court agreed that the gun had been improperly destroyed but believed that trial counsel could have decided not to delve into the issue because "[t]here's all sorts of things that you could open the door to or not want the jury to find out about this weapon" and whether it had been involved in other homicides. It said that, even if trial counsel were deficient for failing to object, there was no prejudice because trial counsel "had some sort of argument to talk about how inept the police department [was] and things of that nature." The post-conviction court did not recall if trial counsel

filed a *Ferguson* motion but said that it had "not heard any good faith basis to think that it would have been exculpatory. It's speculation."

The post-conviction court did not recall any improper argument during trial but stated that trial counsel was reasonable in not objecting to closing argument. It said, "[U]sually experience tells -- dictates that hey, you don't object during closing argument usually because that just brings more attention to whatever you objected to." Regarding the prosecution's saying "that's another lie" in reference to Petitioner's statements to various third parties, the post-conviction court said, "I don't see anything improper about that argument. I don't know how in the world you try that case without making that argument." The post-conviction court noted that, even if trial counsel had objected to closing argument, the trial court would have overruled the objection.

The post-conviction court noted that the proof at trial was strong because Petitioner "was the last one seen with the victim, and he was carrying the gun that turned out to be the murder weapon. He was caught with it later on. That's pretty good proof." Based on these findings, the post-conviction court entered a written order denying relief.

Petitioner now timely appeals.

## Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Waiver*

The State argues that Petitioner has waived several claims because they were not properly presented in accordance with Tennessee Rule of Appellate Procedure 27(a).

Under the heading "Additional Claims of Petitioner to Be Considered," pages 25-28 of the Brief of Appellant is cut and pasted verbatim, including typos, from pages 12-14 of the briefs in support of the third and fourth amended post-conviction petitions, which were filed in the lower court. The next seventeen pages of the Brief of Appellant is cut and pasted verbatim from the original pro se post-conviction petition. In these twenty pages of Petitioner's brief, there are no citations to the post-conviction record.

"The brief of the appellant shall contain under appropriate headings . . . [a] statement of the issues presented for review." Tenn. R. App. P. 27(a)(4); *see also Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) ("Appellate review is generally limited to the issues that have been presented for review."). Moreover, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [c]ourt." Tenn. Ct. Crim. App. R. 10(b).

Therefore, all issues under the heading "Additional Claims of Petitioner to Be Considered" are waived, except for the issues which were also presented for review in accordance with Tennessee Rule of Appellate Procedure 27(a). *See e.g.*, *Trumaine Winters v. State*, No. W2018-02090-CCA-R3-PC, 2020 WL 119619, at *10 (Tenn. Crim. App. Jan. 9, 2020) (quoting *Hodge*, 382 S.W.3d at 335 "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn[essee] R[ule] of App[ellate] P[rocedure] 27(a)(4)."), *perm. app. denied* (Tenn. June 4, 2020). We will address the properly presented issues in kind, which include that Petitioner was denied the effective assistance of counsel for trial counsel's failure to (1) move for a mistrial; (2) file a *Ferguson* motion; (3) cross-examine Lieutenant Borgers; (4) object to improper prosecutorial argument; and (5) raise in the motion for new trial and on direct appeal the issues of improper prosecutorial argument and failure to cross-examine.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same

standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

1. Failure to Move for Mistrial

Petitioner argues that trial counsel was ineffective for failing to move for a mistrial when he learned that, after the alternate jurors had been dismissed, another juror was dismissed due to a family tragedy, leaving the remaining jury panel with eleven jurors.

The State responds that trial counsel made a reasonable tactical decision to not move for a mistrial so that the State would not have the benefit of knowing Petitioner's defense strategy in a second trial. The State also contends that Petitioner benefitted from this decision because he was convicted of the lesser-included offense of second degree murder instead of the charged offense of first degree premeditated murder. Finally, the

State asserts that Petitioner waived the right to a jury of twelve after discussing his options with trial counsel.

In *Delmer Ray Hall v. State*, the petitioner argued that he was denied the effective assistance of counsel and denied the right to a trial by a jury of twelve members. No. 01-C-019109CC00269, 1992 WL 36651, at *1 (Tenn. Crim. App. Feb. 28, 1992), *perm. app. denied* (Tenn. May 26, 1992), *perm. app. dismissed* (Tenn. Oct. 3, 1994). At the petitioner's trial, two of the jurors became ill. *Id*. at *3. Since there was only one alternate juror, the illness of two jurors left a panel of eleven jurors. *Id*. The petitioner's trial counsel explained his options going forward, that the petitioner could

> move the trial court for the entry of a mistrial, continue the case until one of the two jurors was well, or continue with the trial and permit eleven, rather than twelve, jurors to resolve whether he was guilty of the offense charged in the indictment or a lesser[-]included offense.

*Id*. The petitioner wanted his case concluded "at the earliest possible moment," so he decided to proceed with eleven jurors. *Id*. This court noted that, because trial counsel "affirmatively advised the trial court that both the State and the appellant agreed to proceed with only eleven jurors[,]" and because the petitioner "opted to proceed with only eleven jurors after trial counsel had advised him of the options available to him[,]" trial counsel was not ineffective for failing to move for a mistrial. *Id*. at *4.

In the same way, Petitioner testified that trial counsel explained to him that moving for a mistrial due to eleven jurors would allow the State to be aware of his defense strategy. Trial counsel also testified that he explained to Petitioner the disadvantages of moving for a mistrial. He stated that, "with the way that the proof unfolded and the jury composition with the alternates who were struck, [Petitioner] decided to proceed with [eleven] jurors." The post-conviction court concluded that Petitioner made the choice himself to proceed with eleven jurors.[5] It also found that

---

[5] Because the transcript of the hearing on whether to proceed with eleven jurors was not included in the record, this court takes judicial notice of our own records on direct appeal. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009). At trial, the following discussion was had:

[THE COURT]: The obvious question is whether or not [Petitioner] wishes to proceed with only eleven jurors. I think it has happened before. It is constitutional, but it is also his right; and I think it would take some time for [him] and his attorney to talk about it. . . . I'd like you to give it some thought. . . . So, we'll let you all -- take as much time.

(Recess.)

[THE COURT]: Alright, [trial counsel], did you and your client discuss what he wishes to do? . . . [W]hat is his decision as far as going forward with these eleven?

[TRIAL COUNSEL]: [Petitioner]'s decision is to proceed with eleven.

. . . .

- 18 -

Petitioner's decision to move forward was beneficial to Petitioner because Petitioner was convicted of the lesser-included offense of second degree murder instead of first degree premeditated murder.

We conclude that, because trial counsel consulted with Petitioner regarding whether to move for a mistrial and explained the tactical reasons for proceeding, and because Petitioner chose himself to continue with eleven jurors, trial counsel was not deficient for failing to move for a mistrial. Moreover, even if counsel's performance was deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Here, Petitioner was convicted of a lesser-included offense and has presented no evidence that a second trial would have produced a different result. Because Petitioner has not shown "that . . . the result of the proceeding would have been different" had trial counsel moved for a mistrial, Petitioner has not shown prejudice. *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). Petitioner is not entitled to relief.

### 2. Failure to File a *Ferguson* Motion to Dismiss Indictment

Petitioner argues that trial counsel "was ineffective in that he failed to make a *Ferguson* motion for dismissal of the indictment due to loss or destruction of evidence." The State responds that Petitioner has not proved prejudice in trial counsel's failure to file a *Ferguson* motion to dismiss the indictment because there was no exculpatory value in the gun.

In order to determine whether Petitioner was prejudiced by trial counsel's failure to file a *Ferguson* motion, we must first "consider whether [P]etitioner's *Ferguson* issue has merit." *William Thomas Mayers v. State*, No. M2014-01704-CCA-R3-PC, 2016 WL 1268515, at *7 (Tenn. Crim. App. Mar. 31, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016).

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). The court determined that the due process required under the Tennessee Constitution was broader than that required under the United States Constitution and rejected the "bad faith" analysis adopted by the United States Supreme Court. *Id.* at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), which stated that "unless a

[THE COURT]: Okay. Well, that has been done before, obviously; and I believe it is constitutional. . . . And, so, [Petitioner], that's what you wish to do?
[Petitioner]: Yes, sir.

criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Instead, the court in *Ferguson* adopted a balancing approach in which a trial court must determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914.)

When a defendant raises a *Ferguson* claim, a trial court must first "determine whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (footnote omitted).

If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. *Merriman*, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.*

Here, nothing could replace the gun destroyed by the State; however, its exculpatory value was only speculative. *See State v. Thomas Lee Hutchison*, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *24 (Tenn. Crim. App. Apr. 11, 2014), *aff'd*, 482 S.W.3d 893 (Tenn. 2016). Petitioner has presented no evidence that having the gun at trial would have been potentially exculpatory but claims only that its destruction made the gun "unavailable for inspection." He presented no evidence at the post-conviction

hearing, other than his own testimony, that the gun was not the murder weapon, and he does not explain on appeal how the gun could have been exculpatory.

Moreover, trial counsel stated that he did not believe the gun to be exculpatory because Petitioner pled guilty to unlawful possession of the gun in a previous case. Nevertheless, trial counsel asked for a "special jury instruction" regarding the destruction of the gun, but the trial court denied the motion.[6] The trial court stated:

> Although I've heard testimony that this weapon was destroyed, I haven't heard where it's potentially exculpatory. The testing . . . performed on this handgun ha[d] been performed for a long time[.]
>
> I've never seen the defense request that further testing be done on a weapon such as this one the TBI has returned. . . . There wasn't a request in this particular instance either. As a matter of fact, we were set for trial, it looks like, January 10th [2009], but it snowed that day, and all the courts were closed, so we decided to get another date. So, there was no -- I assume the weapon had -- was available to be displayed to the jury on that day [of trial,] and there was never a request to have this tested. So, I think having this jury charge was basically -- basically says that, you know, you can make some sort of inference that the [S]tate is doing something bad or something. I don't see where that applied in this particular case.
>
> . . . .
>
> Whatever duty the [C]onstitution imposes on the [S]tate to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. You know, you made a motion to have this charged, but I don't see -- if you thought that it might be significant in [Petitioner's] defense, there should have been some sort of request to have it tested prior to the trial date of January 10th, [2009] at least.
>
> . . . .
>
> [I]n this particular case, it seems like it's just an effort to use an unfortunate situation to show that there was evidence that would have been

---

[6] Because the transcript of the hearing on the special jury instruction was not included in the record, this court takes judicial notice of our own records on direct appeal. *See Lawson*, 291 S.W.3d at 869.

- 21 -

favorable to [Petitioner] when, in fact, there's nothing in the record that I see that indicates there would have been anything favorable to [Petitioner] at all that could be of any exculpatory value.

As a matter of fact, the fact that the weapon is missing allows you now to really go after the police department, on closing, which I agree would be fair game. . . . [N]ow you can use that to show how inept they are -- so on and so forth. And the fact that it is missing is probably helping you more from that standpoint than if it had been here because you never asked to have it tested. . . . [Y]ou really could have had it tested for yourself prior to last month.

The post-conviction court found that Petitioner was not prejudiced by the destruction of the gun because trial counsel "had some sort of argument to talk about how inept the police department [was] and things of that nature." It is clear from the trial transcript that, had trial counsel filed a *Ferguson* motion to dismiss the indictment, the trial court would have denied the motion based on the same reasoning it stated in its denial of the *Ferguson* motion for a special jury instruction. We conclude that, because the exculpatory value of the gun is speculative at best, and because trial counsel filed a *Ferguson* motion for special jury instruction which was denied, trial counsel was not deficient in failing to file a *Ferguson* motion to dismiss the indictment.

### 3. Failure to Cross-Examine

Petitioner states that trial counsel was ineffective for failing to cross-examine Lieutenant Borgers about the destruction of the gun. The State responds that Lieutenant Borgers was called at trial "for the express purpose of explaining the destruction of the gun" and that he explained the gun was destroyed inadvertently before paperwork linked the gun to the murder of the victim.

Petitioner does not present any argument, citation to authority, or appropriate references to the record regarding this issue. He simply states, "Further[,] [c]ounsel failed to cross[-]examine Richard Borgers about the destroyed weapon." Petitioner makes no argument as to how this inaction was deficient or prejudiced him in any way. Accordingly, this issue is waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [c]ourt.").

## 4. Failure to Object to Improper Prosecutorial Argument

Petitioner argues that trial counsel should have objected to the prosecutor's improper closing argument. The State responds that trial counsel was reasonable in choosing not to object during the State's closing argument.

This court has previously recognized that "[t]he decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), *perm. app. denied* (Tenn. May 11, 2010); *see also Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012), *perm. app. denied* (Tenn. May 16, 2012). Trial counsel "often choose not to object to damaging evidence for strategic reasons, such as to avoid emphasizing [the unfavorable evidence] to the jury." *Derek T. Payne*, 2010 WL 161493, at *15 (internal quotation marks omitted) (alterations in original). As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." *Lamar Brooks*, 2012 WL 112554, at *14. Absent testimony from trial counsel or evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007), *perm. app. denied* (Tenn. May 14, 2007).

Here, trial counsel testified at the post-conviction hearing, "I don't generally object very much during a trial unless it's egregious violation. It makes the defense look desperate. . . . I don't want to look weak, stupid, and desperate." In denying relief, the post-conviction court noted that "usually experience tells -- dictates that hey, you don't object during closing argument usually because that just brings more attention to whatever you objected to." Because the evidence indicates that counsel's decision not to object was tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *Id.* Petitioner is not entitled to relief on this issue.

## 5. Failure to Raise Claims in Motion for New Trial and on Direct Appeal

Petitioner argues that appellate counsel was ineffective for failing to raise in the motion for new trial and on direct appeal the issues of improper prosecutorial argument and the destruction of potentially exculpatory evidence.

A defendant has a right to effective representation both at trial and on direct appeal. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial

and appellate counsel, under the *Strickland* standard set forth above. *Id.* That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id.* at 597; *see also Carpenter*, 126 S.W.3d at 886-88.

Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.

> The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (internal quotation marks and citations omitted).

When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Id.* "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887-88. Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the Petitioner on appeal. *Carpenter*, 126 S.W.3d at 887.

### *a. Improper Prosecutorial Argument*

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the

jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* at 344.

Petitioner did not include in any of his petitions or in his brief on appeal references to the specific statements he takes issue with from the prosecutor's closing argument. However, during the post-conviction hearing, post-conviction counsel did read some prosecutorial statements that he argued were objectionable, and this court takes judicial notice of the trial transcript as well. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009). One prosecutor made the following statements during closing argument:

[Petitioner] is a murderer, point blank. He wasn't [the victim's] friend; he wasn't [the victim's] running buddy; he is a killer.

. . . .

His true face is that of a killer with all his gang tattoos. . . that's what he is; he's a killer.

. . . .

There is no question. [Petitioner] is guilty of murdering [the victim].

. . . .

[H]e concocts his first lie, ladies and gentlemen. ["]Well, I really don't know where [the victim] is, but there was a gang initiation.["] That was his first lie, ladies and gentlemen. No one heard this before. People asking him, where is [the victim]. That's when he told his first lie. . . . He lied point blank.

. . . .

You heard from [Mr.] Carr, [the victim]'s best friend. He told you that they were like brothers. And I submit to you, think back to his demeanor on the stand. He was calm. He answered the questions. . . . He was honest with you. He had no reason to come in here and lie.

. . . .

He didn't tell [Mr. Carr] anything about a gang initiation that day. Where did that story go? [W]here did that tall tale go?

. . . .

[Petitioner] wouldn't even look him in the eye because he's guilty. He knew he had murdered this man's best friend, and he was lying to everybody."

. . . .

There's another lie.  It's a different story every time you talk to this man.   None of it's the truth because he won't tell the truth; that he murdered [the victim].  That's the truth.

. . . .

[Petitioner] is guilty -- no doubt about it.  It's a different story - a different lie every time he talked to somebody, something changed.

. . . .

I submit to you that [Mr.] McReynolds was honest. . . .  So, ladies and gentlemen, let's think about it.  He had no reason to come in here and lie.

. . . .

Once again, he's lying and making stuff up -- just whatever story he can come up with to who[m]ever he's talking to.  That's what he does."

. . . .

"Wouldn't [a kidnapping] be something you would tell your friends/family members?  Wouldn't you think? . . . He lied [l]adies and [g]entlemen.  He lied.  That's the only way you can see it.  He lied.  And why didn't anybody else see this kidnap[p]ing? . . . [N]obody in the whole neighborhood saw it.  That's a little strange.  It didn't happen.  He lied."

These statements rise to the level of improper prosecutorial argument because these statements involve the prosecutor's personal opinions on the truth or falsity of evidence and Petitioner's guilt.  *See Goltz*, 111 S.W.3d at 6 ("It is unprofessional conduct for the prosecutor to express [a] personal belief or opinion as to the truth or falsity of the evidence or the guilt of the defendant."); *see also State v. Clarence William Groves*, No. M2019-00536-CCA-R3-CD, 2020 WL 2391073, at *24 (Tenn. Crim. App. May 12, 2020) ("Without question, the State's numerous statements that the defendant was a 'liar' who provided 'false explanations' for the victim's injuries at trial would have constituted prosecutorial misconduct under plenary review."); *Alfonso Peck v. State*, No. E2009-00779-CCA-R3-PC, 2010 WL 550878, at *7 (Tenn. Crim. App. Feb. 17, 2010) (concluding that "the State made multiple remarks during its closing argument that were improper[,]" commenting "several times on the petitioner's credibility, going so far as to state, 'Now did the defendant lie?  Repetitively.'"); *State v. Stephano Lee Weilacker*, No.

M2016-00546-CCA-R3-CD, 2018 WL 5099779, at *7 (Tenn. Crim. App. Oct. 19, 2018) (stating that, "[c]learly, the prosecutor erred by plainly expressing his opinion, saying [a witness] 'told the truth' in his testimony").

Even though these statements were improper, they were not automatically reversible error. Thus, we will examine the statements through the *Goltz* factors. The trial court took no curative measures regarding these improper statements and stated during the post-conviction hearing that it would have overruled any objection during closing argument. We have no evidence in the record of the intent of the prosecutor in making the statements, though it seems apparent that her intent was to secure a conviction of first degree murder. Moreover, no other errors have been found, so there is no cumulative effect of error.

However, the post-conviction court found that the proof at trial was strong, and we agree. A jailhouse witness heard him confess to the murder. Petitioner was caught with the murder weapon and pled guilty to unlawful possession. Petitioner was the last person seen with the victim and was seen in the location where the body was found and near the approximate time of death. Petitioner's inconsistencies in his story in various conversations with third parties damaged his credibility. Thus, we conclude that, even though the prosecutorial statements were improper, the *Goltz* factors weigh against reversible error. Therefore, based on the record before us, we cannot conclude that appellate counsel was ineffective for failing to preserve and raise the issue on direct appeal. *See id.*; *Carpenter*, 126 S.W.3d at 887.

### b. Failure to Cross-Examine

Petitioner makes a conclusory statement that appellate counsel was "ineffective for failing to raise [the] issue in the motion for new trial and on appeal" that "[trial c]ounsel was ineffective in failing to cross[-]examine [Lieutenant] Borgers . . . regarding the destruction of a revolver alleged by the [S]tate to have been the weapon used in the killing of [the victim]." Petitioner does not present any argument, citation to authority, or appropriate references to the record regarding this issue. Accordingly, this issue is waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [c]ourt.").

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE